[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-13389
_____

D.C. Docket No. 8:09-cv-02621-JSM-TBM

ANTHONY BOOTH,
JERRY BROWN,

Plaintiffs-Appellants,

versus

PASCO COUNTY, FLORIDA,
INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 4420,
d.b.a. Pasco County Professional Firefighters,

Defendants-Appellees.

_____

No. 12-14194
_____

D.C. Docket No. 8:09-cv-02621-JSM-TBM

ANTHONY BOOTH,
JERRY BROWN,

Plaintiffs-Appellees-Cross Appellants,

versus

PASCO COUNTY, FLORIDA,

Defendant-Cross Appellee,

INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 4420,
d.b.a. Pasco County Professional Firefighters,

Defendant-Appellant-Cross Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(July 3, 2014)

Before MARTIN and ANDERSON, Circuit Judges, and FULLER,* District Judge.

_____

*Honorable Mark E. Fuller, United States District Judge for the Middle District of Alabama,
    sitting by designation.

2

ANDERSON, Circuit Judge:

Anthony Booth and Jerry Brown (together "Plaintiffs") are employees of the Emergency Services Department ("Department") in Pasco County, Florida ("County"), and members of the International Association of Firefighters Local 4420 ("Union"). Plaintiffs sued the County and the Union claiming violations of Title VII and the Florida Civil Rights Act.[1] The case went to trial on Plaintiffs' retaliation claims. A jury returned verdicts against both defendants.

The district court subsequently granted the County's motion for judgment as a matter of law on the ground that there was insufficient evidence of a retaliatory motive. The court also denied Plaintiffs' motion for a new trial against the County. Plaintiffs appeal both of these decisions.

The district court denied the Union's motion for judgment as a matter of law or, in the alternative, a new trial or reduction of the damages awarded against it. The Union appeals that decision. Plaintiffs cross-appeal the district court's refusal to award equitable relief against the Union.[2]

---

[1]    Plaintiffs also sued the Union under 42 U.S.C. § 1981, but that claim is not at issue on appeal. Decisions construing Title VII guide our analysis of the Florida Civil Rights Act. Holland v. Gee, 677 F.3d 1047, 1054 n.1 (11th Cir. 2012).

[2]    Plaintiffs also cross-appeal the district court's refusal to require that the Union post a supersedeas bond pending the outcome of this appeal. That aspect of Plaintiffs' cross-appeal is dismissed as moot.

3

For the following reasons, we reverse the district court's entry of judgment in favor of the County and affirm in all other respects.

## I.    FACTS AND PROCEDURAL HISTORY

We recount a relevant subset of the facts established at trial.

### A. Plaintiffs' Grievances About Their Supervisor

Booth and Brown were Department emergency-services workers assigned to Station 14.  In June 2007, Booth filed a Department grievance against the captain who supervised the station.  The captain's boss had warned Booth that he would be transferred if he filed a grievance, and Booth was in fact transferred, against his wishes, pending investigation.

In his grievance, Booth named Brown as a witness.  The station captain allegedly threatened Brown as a result, causing Brown to file a grievance of his own in July 2007.

### B. The County's Response to Plaintiffs' Grievances

In November 2007, the offending captain was disciplined and transferred out of Station 14.  Booth returned to Station 14, but he was assigned, against his wishes, to work on an ambulance rather than a fire engine.  Coworkers who had submitted written statements on Booth's behalf had been transferred out of Station 14, and the only coworker who had not submitted a written statement remained. Brown was transferred to another station that was physically unpleasant and in a

4

state of some disrepair.  All of these reassignments were for a minimum of six months.  Department officials testified that these reassignments were part of an attempt to address a "country club" atmosphere that predated the subject of Plaintiffs' grievances.

Plaintiffs and their coworkers believed the transfers to be retaliatory.  They complained to the County and sought help from the Union, to no avail.  On April 11, 2008, Plaintiffs filed charges against the County and the Union with both the EEOC and the Florida Commission on Human Rights ("FCHR").  In the charges, Plaintiffs complained about the actions of their former captain, as well as the County's and the Union's responses to their internal complaints.

### C. The Union's "Update on Legal Issues" Memo

Union President Ralph Grant subsequently received unsolicited phone calls about a rumored lawsuit against the Union and the identity of the parties involved.  Grant testified that the membership generally demanded to be told about legal matters in which the Union was involved.  He said that he wanted to respond to the rumors and to inform the members about the situation, the Union's position, the Union's plan, and the potential costs.[3]

---

[3]    The Union is funded through membership dues.  The Union may also assess additional fees if the assessment is approved by a majority of the members in good standing at least thirty days after they are notified of a vote.

5

On April 21, 2008, Grant emailed Department Chief Anthony Lopinto asking him to forward an attached memorandum ("Memo") to all members of the Union's bargaining unit, nearly all of whom were Union members,[4] pursuant to a prior agreement between the Union and the County regarding distribution of Union communications. The subject line of Grant's email was "Discrimination."[5] The title of the Memo was "Update on Legal Issues." Grant had previously had the Memo reviewed by the Union's attorneys. At trial, he testified that he had talked to an attorney about how to respond to Plaintiffs' charges. At a prior deposition, however, he testified that he did not recall being advised on whether to comment on Plaintiffs' charges.[6]

The same day, Chief Lopinto forwarded the Memo to County Personnel Chief Barbara DeSimone and Department Personnel Chief Cynthia Holland for review. The following day, on April 22, DeSimone emailed Grant and asked him to make edits to portions that did not discuss Plaintiffs. DeSimone said that Grant could then forward the Memo to Lopinto for dissemination. Two days later, on April 24, Grant emailed a revised copy of the Memo to DeSimone. In the body of

---

[4]    The Union is the exclusive bargaining agent for most of the Department's approximately four hundred employees. Membership is voluntary, but Union members comprised approximately 95% of the force at the time of trial.

[5]    The Memo discussed five matters, one of which was Plaintiffs' charges. None of the other matters involved alleged discrimination.

[6]    Plaintiffs' counsel read this portion of the deposition at trial.

the email, he asked DeSimone to "[c]heck this and let me know.  I think our members have a right to know about the charges two of their peers are making against both the Union and the County."  The record does not reveal whether DeSimone responded to this email.

One day later, on April 25, Chief Lopinto emailed the revised Memo to station email addresses, where it could be accessed by Department employees working at each station.  An unknown person, or persons, also posted the Memo on at least some station bulletin boards with Plaintiffs' names highlighted.  The Memo read, in relevant part, as follows:[7]

> FLSA Lawsuit
>
> . . . [A]ll those entitled to back-pay will be receiving 150% of what is owed from June 14, 2005. . . .
>
> ULP on Cody Study
>
> . . . [W]e know that there are some members that have expressed concern that their back-pay calculations may be wrong.  Those concerns should be submitted to the union. . . .
>
> ULP on Impasse Hearing Cancellation
>
> . . . [T]he Executive Board and our attorney's [sic] feel the cost in pursuing it may not be worth the remedy. . . .
>
> ULP on Changing Insurance Coverages
>
> This charge has been dropped . . . .

---

[7]    Only the last matter discussed is relevant to this case.  We include excerpts regarding the other matters only to provide context.

7

EEOC Discrimination Charges

Local 4420 members Jerry Brown and Anthony Booth have filed a Charge claiming unspecified discrimination with the U.S. Equal Employment Opportunity Commission against the Union and the County. The Executive Board and our attorney feel it is a frivolous claim with no grounds for support and we are extremely confident in winning but will still have to defend the charges. This could be very costly and generate a legal bill of $10,000 or more. If it becomes too costly the Union may have to assess its members additional fees to offset the cost. We will update you as it progresses.

The last quoted paragraph names Plaintiffs. Plaintiffs testified that they did not recall the Union previously naming any individual who was involved in a dispute. They also introduced examples of communications in which individuals were not named.[8] President Grant testified that he had probably named individuals in prior updates, but he could not recall any examples (other than when he had named himself). He also testified that he named Plaintiffs in order to inform the members and respond to rumors because the members had a right to know who was involved.

The last quoted paragraph of the Memo also states that it could cost the Union $10,000 or more to defend against Plaintiffs' charges and that it may be necessary to assess additional fees from the membership. President Grant testified that, at the time of trial, this matter had cost substantially more than $10,000 but had not resulted in an assessment of additional fees.

---

[8] None of these examples involved a dispute between the Union and its members. All involved disputes between Union members and the County.

Plaintiffs maintain that nearly all of their coworkers subsequently shunned them. For example, Brown testified that one coworker said "somebody needed to shut [his] f'ing mouth before their dues went up" and that another tried to provoke him into a fight. Plaintiffs maintain that their superiors and coworkers worked to deny them access to available vacation days, voluntary overtime, and "shift swaps."[9] On May 24, 2008, an unknown person also put a custom-made sticker with the words "Department Asshole" on Brown's locker. Brown maintains that this incident was under-investigated and characterized the incident, in a complaint to Department Chief Lopinto dated May 31, as part of the "continued harassment and a hostile work environment" that had resulted from the Memo. Both Plaintiffs allegedly faced resistance when requesting transfers to different stations. Plaintiffs and their wives also testified to the emotional impact that this alleged ostracism had on them throughout the relevant period.

In October 2008, Plaintiffs filed additional EEOC and FCHR charges about the Memo, the harassment that it allegedly caused, and the alleged difficulty that Plaintiffs faced in convincing coworkers to "swap shifts" with them. Union President Grant subsequently ordered the Memo removed from station bulletin

---

[9] A "shift swap" is a voluntary exchange of shifts between coworkers, subject to supervisor approval.

boards, but Brown testified that it was still posted in Booth's station as of January 2009.

### D. The Instant Lawsuit

Plaintiffs filed the instant lawsuit in November 2009. Shortly thereafter, someone posted a newspaper article about the lawsuit on fire station bulletin boards. In January 2010, Brown became aware of the postings and complained about them on the ground that they had been posted without the required authorization. When the postings were not removed, Brown removed them himself and tore them up.

At Booth's station, someone retrieved the discarded posting, taped it back together, and re-posted it. Brown went to the station, removed the article, and shredded it. Someone then photographed the shredded article, put the photograph on the station computer as "wallpaper," and emailed the photograph to a captain at Booth's station, telling him to "[l]ook at what your shit-bag firefighter did." Brown understood this to be an accusation against Booth, and he went to the station to say that it was he (Brown) who had shredded the article. He was subsequently subject to disciplinary investigation for taking the matter into his own hands. He then filed a grievance about the newspaper article and associated harassment, but the grievance was denied as untimely.

10

In April 2010, four months after Brown had reported the posting of the newspaper article, the County reprimanded captains who had done nothing about it and had their superiors investigate whether any unauthorized postings remained. Brown maintains that this incident was under-investigated.

In March 2010, Brown filed additional EEOC and FCHR charges, alleging retaliation based on the newspaper-article-posting incident. In May 2010, Booth filed his own additional EEOC and FCHR charges, alleging retaliation based on the continued posting of both the Memo and also newspaper articles about Plaintiffs' lawsuit. Plaintiffs maintain that the retaliatory harassment against them continued and that the County took no remedial steps.

### E. Plaintiffs' Affidavits and the County's Response

On July 27, 2011, Plaintiffs filed affidavits in the instant lawsuit in support of their opposition to the Union's motion for summary judgment. In their affidavits, Plaintiffs expressed concern that they could no longer trust their coworkers and feared that their coworkers would subject them to, or fail to protect them from, dangerous or even life-threatening situations.[10]

---

[10]    For example, Booth suggested that his coworkers might manipulate the water pressure on a fire hose that he was carrying or decline to rescue him from a collapsed structure. Brown suggested that his coworkers might be intentionally irresponsible with station equipment that he was later scheduled to use.

11

The County's attorney apparently emailed these affidavits to County Personnel Manager DeSimone (and one other individual) on August 22, 2011, along with the following comment:

> I am somewhat concerned about their attestation that they claim to feel unsafe and am concerned that while we certainly do not want to retaliate in any way, Chief Lopinto still has a department to run and safety for the public is paramount. It seems like some kind of meeting in which cooperation is emphasized both by these two plaintiffs and by their co-workers and captains might be in order. I am happy to discuss with you.

DeSimone testified that she considered having such a meeting and discussed it with Department Chief Lopinto. She did not think that such a meeting ever took place, however, and she explained that it would have been difficult to schedule one because a third of the force was always on duty.

County Risk Manager Jane Calano worked under DeSimone. Calano testified that, based on Plaintiffs' affidavits, she became concerned that their fear would render them unable to perform their duties. On August 24, 2011, she emailed an account manager at the company that manages the County's Employee Assistance Program benefits. In her email, Calano explained the situation as follows:

> We have two firefighters who have filed a lawsuit against the County and their Union for retaliation. They have filed affidavits with the Court that they are now forced to work in "an untrustworthy environment." They claim they no longer feel safe because their co-workers may not protect them in an emergency situation and so on. Do you think this is a situation that would lend itself to an assessment

12

of these two individuals to determine the legitimacy and the depth of their fears?

Calano testified that, based on the account manager's response, she proceeded with the process of subjecting Plaintiffs to fitness-for-duty examinations. She did not speak with Plaintiffs or their supervisors before recommending the examinations.

Department Chief Lopinto testified that he and DeSimone jointly made the final decision to subject Plaintiffs to fitness-for-duty examinations. Lopinto said that some of the concerns Plaintiffs expressed in the affidavits were "preposterous" and "paranoid." He questioned whether Plaintiffs possessed the "clear mind" and focus necessary to protect public safety. He did not speak with Plaintiffs or their supervisors before ordering the examinations.

When Plaintiffs arrived at work on August 31, 2011, they were informed by coworkers that they should call Department Personnel Chief Holland regarding fitness-for-duty examinations. Brown testified that it was Department policy to keep such examinations confidential. Plaintiffs called Holland and were told to report to Calano. Calano told Plaintiffs that they would not be allowed to return to work until they had successfully completed fitness-for-duty examinations. Plaintiffs were required to sign a statement including the following passage:

> Due to statements made in my recent affidavit that I fear for my safety in the workplace and the possibility that I may pose a risk to myself or others if I am unable to perform the duties of my position, I . . . agree that my continued employment with Pasco County is expressly conditioned upon my agreement to submit to an assessment by a

13

Professional Counselor to determine my Fitness for Duty and to address personal stress and/or safety related issues. . . .

I understand that my failure to comply with any of the terms of this letter shall constitute sufficient grounds for disciplinary action up to and including termination.

Plaintiffs were sent to an initial evaluation and were required to attend six follow-up visits. There is a dispute regarding who ordered the six follow-up visits. Calano testified that it was the counselor's decision. Plaintiffs testified that the counselor told them they were fit for duty and did not meet any of the criteria for the examination. In any event, Plaintiffs were permitted to return to work once Calano received word that they did not pose a risk to themselves or others.

### F. Plaintiffs' Retaliation Claims Are Tried by Jury

Plaintiffs' retaliation claims went to trial by jury. The district court provided the jury with four verdict forms—one for each pair of plaintiffs and defendants. Each verdict form asked whether the defendant in question had taken any "adverse actions" against the applicable plaintiff and, if so, to identify them. The court had previously instructed the jury that an adverse action was "something that would have dissuaded a reasonable [worker or Union member] from making or supporting a complaint of discrimination."[11]

_____

[11]    The court had also instructed that the defendants could be liable for the conduct of Plaintiffs' coworkers and fellow Union members if the defendants "either orchestrated the retaliation or knew about the retaliation and acquiesced in it in such a manner as to condone and encourage the co-workers' actions."

14

The jury wrote that the Union took the following adverse actions toward Plaintiffs: "NAMING PLAINTIFF[S] IN THE LEGAL UPDATE MEMO AND EDITORIALIZING ABOUT POSSIBLE RAMIFICATIONS TO UNION MEMBERS." The district court understood the jury to have interpreted the Memo as a "call for reprisal" against the two specifically identified Plaintiffs. The jury wrote that the County took the following adverse action toward Plaintiffs: "FORCING PLAINTIFF[S] TO SIGN A STATEMENT UNDER THREAT OF TERMINATION WHICH RESULTED IN A FITNESS FOR DUTY EXAMINATION."

The court had previously instructed the jury that, in order to establish unlawful retaliation, Plaintiffs were required to prove that the adverse action would not have occurred "but for" Plaintiffs' protected activity. On the verdict forms, the jury found that the aforementioned adverse actions were taken because of Plaintiffs' grievance(s) or EEOC charge(s), which the parties had stipulated were "protected activity" under both Title VII and the Florida Civil Rights Act.

The verdict forms asked what damages, if any, Plaintiffs should be awarded for various categories of harm. The jury wrote that Booth should be awarded $500 in backpay and $10,000 for emotional pain and mental anguish from the County. The jury wrote that Brown should be awarded $500 in backpay and $12,000 for emotional pain and mental anguish from the County. The jury wrote that each

15

plaintiff should be awarded $75,000 for emotional pain and mental anguish from the Union. On a separate form, completed later, the jury found that each plaintiff should be awarded $8000 in punitive damages from the Union.[12]

### G. The District Court Rules on Post-Trial Motions

The district court granted the County's motion for judgment notwithstanding the verdict after concluding that there was insufficient evidence to support the finding that the County ordered the fitness-for-duty examinations for a retaliatory purpose. The court also denied Plaintiffs' motion for a new trial against the County, without a written opinion. Plaintiffs appealed those decisions.

The Union moved for judgment as a matter of law on multiple grounds, including that the First Amendment precluded an entry of judgment on the verdict as returned. In the alternative, the Union moved for a new trial or a reduction in damages. The district court denied the Union's motion, and the Union appealed. Plaintiffs cross-appealed the district court's refusal to grant equitable relief against the Union. We will address each aspect of these appeals in turn.

## II.  THE COUNTY'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

The jury found that the County subjected Plaintiffs to fitness-for-duty examinations because of their grievances and charges against the County. The

---

[12]    Plaintiffs did not seek punitive damages against the County. See 42 U.S.C. § 1981a(b)(1) (providing for punitive damages against defendants "other than a government, government agency or political subdivision").

16

district court held that there was insufficient evidence to support this finding.  We disagree.  We review de novo the order granting the County's motion for judgment as a matter of law.  Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192 (11th Cir. 2004).  We review all of the evidence in the record and draw all reasonable inferences in Plaintiffs' favor.  Id. at 1192–93.  Judgment as a matter of law was appropriate if there was no legally sufficient basis for the jury's finding.  See id. at 1192 (citing Fed. R. Civ. P. 50).

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, --- U.S. ---, ---, 133 S. Ct. 2517, 2528 (2013).  The County maintains that it ordered the fitness-for-duty examinations because of legitimate safety concerns.  The crucial question is not whether these concerns were well-grounded but whether they actually motivated the County.  See Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) (per curiam).  If the jury was required to believe the County's proffered explanation, then Plaintiffs failed to show that "the desire to retaliate was the but-for cause."  Nassar, --- U.S. at ---, 133 S. Ct. at 2528.  On the other hand, if the jury was permitted to disbelieve the County, it may have been permitted to infer that the County's actions were retaliatory.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S. Ct. 2097, 2108 (2000) ("Proof that the

17

defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination . . . .").

Although the factual question is extremely close, we conclude that the jury was permitted to find the County's action retaliatory. Plaintiffs' affidavits may have raised serious concerns regarding their fitness for duty, but there was evidence tending to establish that at least DeSimone and Calano believed Plaintiffs' statements to have a possible basis in reality.[13] Despite this possibility, the County ordered the examinations without ever speaking to Plaintiffs or their supervisors. The County also failed, entirely, to investigate the potential factual basis for Plaintiffs' statements, even after Plaintiffs had been declared fit for duty (and presumably not "paranoid").

In addition, both Plaintiffs testified that, according to the professional counselor, they did not meet the criteria for the examination. There was also a dispute of fact regarding who ordered the six follow-up visits—Calano or the counselor. Finally, there was an ongoing dispute at trial regarding the sufficiency of the County's investigation of Plaintiffs' prior complaints and grievances. Since "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" we

---

[13]    DeSimone considered scheduling a meeting to emphasize cooperation among both Plaintiffs and their coworkers. Calano asked the benefits program account manager if the fitness-for-duty examinations would be an appropriate way to assess "the legitimacy and the depth" of Plaintiffs' fears.

must resolve all of these factual disputes in Plaintiffs' favor.  See Reeves, 530 U.S. at 150–51, 120 S. Ct. at 2110 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986)).  We recognize the potential safety concerns presented by the statements in Plaintiffs' affidavits, but under the circumstances, the jury was permitted to find that the desire to retaliate was a "but-for" cause of the County's decision.

## III.    PLAINTIFFS' MOTION FOR A NEW TRIAL AGAINST THE COUNTY

Apparently believing that the verdict against the County was inadequate even as returned, Plaintiffs moved for a new trial on multiple grounds.  We find it necessary to discuss only certain challenges to the district court's jury instructions.[14]

The refusal to give a requested jury instruction is an abuse of discretion only when "(1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party."  Goulah v. Ford Motor Co., 118 F.3d 1478, 1485 (11th Cir. 1997).  "The district court's refusal to give

---

[14]    Plaintiffs' other challenges to the district court's jury instructions are without merit and warrant no discussion, nor can we conclude that the district court abused its broad discretion in fashioning the verdict forms.  Plaintiffs' evidentiary challenges, challenge to the amount of time allocated to their closing argument, and all other issues raised by Plaintiffs on appeal are also without merit and warrant no discussion.

requested instructions is not error if the substance of the proposed instruction was covered by another instruction, which was given." Id.

## A. Plaintiffs' Requested Instruction on Employer Liability for Coworker Harassment

Plaintiffs asked the district court to instruct the jury that the County could be liable for retaliatory harassment by Plaintiffs' coworkers if it "knew or should have known about the harassment but failed to take prompt and effective remedial action to stop the retaliation." That might have been an appropriate instruction had Plaintiffs claimed that the coworker retaliation rose to the level of an actionable hostile environment. See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1278 (11th Cir. 2002) (applying Plaintiffs' proposed standard to a racial-discrimination-based hostile environment claim); Gowski v. Peake, 682 F.3d 1299, 1311–12 (11th Cir. 2012) (per curiam) (recognizing the existence of a retaliation-based hostile environment claim). Plaintiffs, however, expressly disavowed bringing a hostile environment claim. Success on such a claim, moreover, would have required proof "that the actions complained of were sufficiently severe or pervasive to alter the terms and conditions of employment." Gowski, 682 F.3d at 1312. Plaintiffs do not argue that this requirement was satisfied, nor did they so argue below. Absent any claim that their coworkers' harassment rose to this level, we doubt that Plaintiffs' proposed instruction was a correct statement of the law. See Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 419 (8th Cir. 2010) ("When an employee

20

complains about inappropriate conduct that does not rise to the level of a violation of law, . . . there is no liability for a failure to respond.").

The district court, moreover, instructed that the County could be liable for coworker retaliation if the County's "supervisory or management personnel either orchestrated the retaliation, or knew about the retaliation and acquiesced in it in such a manner as to condone and encourage the co-workers' actions." See also Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1265 (10th Cir. 1998) (applying this standard to a retaliatory hostile environment claim). Even if Plaintiffs' requested instruction were a correct statement of the law, which we doubt, Plaintiffs have not demonstrated that they suffered any prejudice as a result of the district court's alternative choice of instruction.

## B. Plaintiffs' Requested Instruction on the "Adverse Action" Materiality Requirement

The district court instructed the jury that the County could be liable for unlawful retaliation only if it took an "adverse action" against Plaintiffs that was "materially adverse, that is, something that would have dissuaded a reasonable worker from making or supporting a complaint of discrimination." Plaintiffs asked the district court to instruct the jury that, "[e]ven if you find that a particular action, standing alone, would not be sufficient to constitute an 'adverse action,' you may determine that, when considered collectively, all the actions are sufficient to

21

constitute an adverse action." Plaintiffs argue that the failure to give this instruction was reversible error.

The County did not object to the proposed instruction at trial, nor does it challenge its accuracy on appeal. See also Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002). Plaintiffs have failed to persuade us, however, that they suffered prejudicial harm. As an alternative to giving the instruction, the district court permitted Plaintiffs to make the same point during closing argument. While this solution was unorthodox, it mitigated any prejudice that may have otherwise resulted. In addition, we note the risk in this case that the jury would improperly attribute the County's actions to the Union, and vice versa. The wording of Plaintiffs' proposed instruction may have exacerbated that risk, and the district court was within its discretion to consider that possibility when declining to give the instruction.

## IV.    THE UNION'S MOTION FOR JUDGMENT AS A MATTER OF LAW, A NEW TRIAL, OR A REDUCTION IN DAMAGES

The Union argues that it was entitled to judgment as a matter of law on multiple grounds or, in the alternative, a new trial or a reduction in damages. Only one of the Union's arguments warrants extended discussion.[15]

---

[15]    Here we respond briefly to the Union's other arguments, beginning with those made in support of its motion for judgment as a matter of law. There was ample evidence to support the jury's verdict against the Union. The affirmative defense established in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998), was not available because when Grant disseminated

22

The jury found that the Union retaliated against Plaintiffs by naming them in the Memo and "editorializing about possible ramifications to Union members." The Union argues that the imposition of liability on this basis violates its First Amendment right to freedom of speech.[16]  In other words, the Union raises an as-applied challenge to Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), and analogous Florida law as a defense to liability under those provisions.  We analyze the Union's First Amendment argument.

**A. Standard of Review**

We review de novo the denial of a motion for judgment as a matter of law, examining all of the evidence in the record.  Gowski, 682 F.3d at 1310.  "Ordinarily, we review district court factfindings only for clear error, but First Amendment issues are not ordinary.  Where the First Amendment Free Speech

---

the Memo, he was acting in his capacity as Union president and, therefore, "may be treated as the organization's proxy."  Faragher, 524 U.S. at 789, 118 S. Ct. at 2284; see also Dees v. Johnson Controls World Servs., Inc., 168 F.3d 417, 421 n.9 (11th Cir. 1999) ("An employer is always liable for tortious conduct committed by a supervisor within the scope of his employment.").  Even if the Ellerth-Faragher defense had been available, moreover, the Union failed to support it factually.  Finally, even if an equitable defense might be available in some circumstances, the district court did not err in concluding that such a defense was not appropriate in this case.

With respect to the Union's motion for a new trial, we cannot conclude that it was an abuse of discretion for the district court to deny the Union's motion for severance.  With respect to the Union's argument for a reduction in damages, we cannot conclude that the district court erred with respect to either compensatory or punitive damages.   There was sufficient evidence to support both awards, and we cannot conclude that the jury was swayed by inappropriate factors.

[16]    The Union also argues that the imposition of liability on this basis violates its First Amendment right to petition for the redress of grievances and its First Amendment right to freedom of expressive association.  These arguments add little to nothing of merit, and we do not separately discuss them here.

Clause is involved our review of the district court's findings of 'constitutional facts,' as distinguished from ordinary historical facts, is de novo." ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1203 (11th Cir. 2009); see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 567, 115 S. Ct. 2338, 2344 (1995) ("[T]he reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection."). Constitutional facts are "the ultimate fact[s] upon which the resolution of the constitutional question depends," as distinguished from preliminary factual issues. ACLU of Fla., 557 F.3d at 1204. "Where the line is drawn varies according to the nature of the substantive law at issue." Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 501 n.17, 104 S. Ct. 1949, 1960 n.17 (1984).

Although we review findings of "constitutional fact" de novo, we review other subsidiary findings of historical fact for clear error, and we defer to the jury's credibility determinations unless they are clearly erroneous. See Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 688, 109 S. Ct. 2678, 2696 (1989); ACLU of Fla., 557 F.3d at 1203.

### B. The Nature of the Burden

24

At the outset, we assume arguendo that the entry of judgment on the verdict against the Union was a content-based burden on the Union's speech. We believe that the Union's Memo could, alternatively, be viewed as part and parcel of a course of retaliation that included not only speech but also conduct.[17] The district court construed the Union's speech as a "call for reprisal," and we are in basic agreement with the district court's construction. See infra note 21 and accompanying text. The Memo did not specify that the contemplated retaliation would take the form of speech rather than conduct, and the retaliation that actually resulted from the Union's call for reprisal took the form of both speech and conduct.[18] As the First Circuit has explained:

> In outlawing retaliation, [the government] prohibited a type of conduct that can, and often does, include speech. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456, 98 S. Ct. 1912, 56 L. Ed. 2d 444 (1978) (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S. Ct. 684, 93 L. Ed. 834 (1949)) (internal quotation marks omitted); see also R.A.V. v. City of St. Paul, 505 U.S. 377, 389, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct."); NLRB v. Gissel Packing Co., 395 U.S.

---

[17]    The anti-retaliation laws are generally directed at conduct rather than speech. See Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist., 605 F.3d 703, 710 (9th Cir. 2010) (discussing anti-harassment law).

[18]    The ensuing retaliation by Union members included not only retaliatory verbal comments and ostracism but also conduct in the form of denying "shift swaps," denying access to vacation and overtime, and resisting when Plaintiffs requested transfers to different stations.

25

575, 618, 89 S. Ct. 1918, 23 L. Ed. 2d 547 (1969) (finding no First Amendment protection, in the context of the National Labor Relations Act, for employer's anti-union comments if those comments constitute "a threat of retaliation based on misrepresentation and coercion").

Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 83 (1st Cir. 2007). To the extent that the Union's liability is based on statements that are integral or akin to a retaliatory course of conduct, Dixon provides support for rejecting the Union's First Amendment defense on that ground, or at least for treating the burden on the Union's speech as incidental to the regulation of its retaliatory conduct. See United States v. O'Brien, 391 U.S. 367, 88 S. Ct. 1673 (1968).

In Holder v. Humanitarian Law Project, 561 U.S. 1, 28, 130 S. Ct. 2705, 2724 (2010), however, the Supreme Court rejected the argument that a law prohibiting the provision of material support to terrorist organizations should be treated as a regulation of conduct rather than speech because, although the statute was directed at conduct, "as applied to plaintiffs the conduct triggering coverage under the statute consist[ed] of communicating a message." Because the application of the statute depended on what the plaintiffs wanted to communicate, the statute was treated as a content-based restriction on speech. Id. at 27, 130 S. Ct. at 2723–24. In the present case, the Union similarly argues that its liability was

26

triggered solely by its speech in the Memo, and on the basis of that speech's content.[19]

It is not at all clear that Humanitarian Law Project is on point. Unlike the plaintiffs in that case, who would have triggered the statute because of their desire

---

[19]    It is generally believed that laws against status-based discrimination, e.g., laws against discrimination on the basis of "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2, at least sometimes burden speech on the basis of its content. See Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 206 & n.6 (3d Cir. 2001) (Alito, J.) (collecting authorities). "Indeed, a disparaging comment directed at an individual's sex, race, or some other personal characteristic has the potential to create an 'hostile environment'——and thus come within the ambit of anti-discrimination laws——precisely because of its sensitive subject matter and because of the odious viewpoint it expresses." Id. at 206.

It is less clear that anti-retaliation laws, such as the ones at issue here, function as content-based restrictions on speech. It is true that liability under the anti-retaliation laws may sometimes attach because of the content of a particular statement, which supports the argument that those laws may be content-based in application. See Humanitarian Law Project, 561 U.S. at 27–28, 130 S. Ct. at 2723–24; Eugene Volokh, Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones, 90 Cornell L. Rev. 1277, 1278–1311 (2005). It seems unlikely, however, that liability will often attach because of disagreement with the speaker's message. See, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754 (1989) ("The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."). But see Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642, 114 S. Ct. 2445, 2459 (1994) ("[W]hile a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases."). We might expect a jury, for example, to have strong opinions about disparaging comments directed at an individual's sex or race, but it seems unlikely that the jury would have strong opinions about disparaging comments directed at an individual's attempt to enforce his rights under the anti-discrimination laws. It is true, however, that the anti-retaliation laws encompass only retaliation that occurs because of a preceding attempt to enforce the anti-discrimination laws. See 42 U.S.C. § 2000e-3(a); Univ. of Tex. Sw. Med. Ctr. v. Nassar, --- U.S. ---, ---, 133 S. Ct. 2517, 2528 (2013). Thus, to the extent that the anti-discrimination laws operate as content-based speech restrictions, the anti-retaliation laws that enforce them may arguably be content-based in a derivative sense.

In any event, we do not think that the jury in this case found the Union liable because of disagreement with the Union's message. Indeed, we doubt that the jury had any substantial opinion about the merits of Plaintiffs' original discrimination charges (which were not entered into evidence) or the likely cost of the Union's defense. If the application of the anti-retaliation laws in this case is content-neutral rather than content-based, it is easily upheld. See generally Turner Broad. Sys., Inc., 512 U.S. at 662, 114 S. Ct. at 2469 (outlining the standard).

27

to communicate a message, the Union here at least arguably was not communicating a message at all.[20]  Rather, the Union's speech in the Memo was a call for retaliation and a threat of further retaliation.  See infra notes 21–22 and accompanying text.  It is at least arguable that the Union's statements amounted to speech that is incidentally proscribable because it is used to aid in an unlawful act, like the statement, "Go to bed with me if you want a raise."  1 Rodney A. Smolla, Smolla and Nimmer on Freedom of Speech § 13:7, at 13-21 (2014).

However, because of the lack of clarity in the case law, we decline to hold that a lesser scrutiny should apply merely because the Union's call for retaliation initiated and was inextricably intertwined with the actual retaliation (both speech and conduct) that predictably resulted.

## C. The First Amendment Analysis

Even assuming that the restriction on the Union's speech, as embodied in the instant judgment, is content-based, we nevertheless reject the Union's argument that the First Amendment immunizes it under the facts of this case.  Although we recognize that "anti-discrimination laws are [not] categorically immune from First Amendment challenge," Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 209 (3d Cir. 2001) (Alito, J.), the following reasons contribute to our conclusion.

---

[20]    Humanitarian Law Project is also distinguishable on the ground that the plaintiffs in that case desired to communicate messages of a political nature.  561 U.S. at 37–38, 130 S. Ct. at 2729.  We hold in Part IV.C, infra, that the Union's statements in this case did not even pertain to a matter of public concern.

28

First, it is absolutely clear that there is a compelling government interest. "[P]reventing discrimination in the workplace . . . is not only a legitimate, but a compelling, government interest." Id. (citing Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 549, 107 S. Ct. 1940, 1948 (1987)).  The purpose of the anti-retaliation provisions at issue in this case is to "secure that primary objective by preventing [a labor organization] from interfering (through retaliation) with [a member's] efforts to secure or advance enforcement" of the "basic guarantees" of the anti-discrimination laws.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63, 126 S. Ct. 2405, 2412 (2006).

Second, on the basis of our independent review, we conclude that the Memo contained both an implicit "call for reprisal" and also a threat of further retaliation. In the Memo, the Union intentionally invited its members to retaliate against Plaintiffs because Plaintiffs had filed EEOC charges.[21]  A crucial part of this "call

---

[21]    Union President Grant testified that he disseminated the Memo in order to inform the Union's members and respond to questions and rumors.  Plaintiffs presented evidence, however, tending to establish that the naming of Plaintiffs was unprecedented.  Moreover, Grant testified at trial that, although the cost of the Union's defense had substantially exceeded his expectation as of the time of the Memo, no additional assessment had been levied.  The jury could have readily believed that Grant's threat of additional assessments was baseless.  By finding that Grant's action was retaliatory, the jury necessarily rejected Grant's facially plausible explanations.  In light of Plaintiffs' evidence supporting a contrary inference, the jury's credibility determination was not clearly erroneous, and we defer to it.  See Harte-Hanks Commc'ns, 491 U.S. at 689–91, 109 S. Ct. at 2696–97.

Likewise, we agree with the jury that the Union's actions were likely to provoke, and did in fact provoke, retaliatory harassment by Plaintiffs' coworkers.  In reaching this determination, we are sensitive to the context in which the statements were made.  Union members reading a Memo from their president may "pick up intended implications . . . that might be more readily dismissed by a more disinterested ear."  NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89

for reprisal" was a threat that the cost of the Union's defense would result in additional dues assessments, which the individual members would be required to pay. Because no such assessment was ever levied, this statement was reasonably perceived as a baseless threat of further retaliation if Plaintiffs did not drop their EEOC charges.[22]

We find support in the context of federal labor laws governing the workplace, which for our purpose are analogous to civil rights laws governing the workplace. In the former context, the Supreme Court has held that the First Amendment does not immunize an employer's statement to its employees that a vote to unionize could lead to the closing of their workplace when "the statement is [not] a reasonable prediction based on available facts but [rather is] a threat of retaliation based on misrepresentation and coercion, and as such [is] without the protection of the First Amendment." NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S. Ct. 1918, 1942 (1969). As in Gissel Packing, the speech in the instant case was reasonably viewed as a baseless threat rather than a reasonable prediction. Because the government's interest in preventing discrimination in the workplace is at least as

---

S. Ct. 1918, 1942 (1969); cf. Rodriguez, 605 F.3d at 710 (distinguishing between supervisor and coworker speech). The evidence at trial established that, following the dissemination of the Memo, Plaintiffs were ostracized by their coworkers, nearly all of whom were Union members.

[22]    We recognize that the Union could not levy such an assessment without the approval of the membership. The Union's baseless assertion is, nevertheless, reasonably understood as an attempt to intimidate Plaintiffs.

compelling as its interest in prohibiting unfair labor practices, we believe that

Gissel Packing provides significant support for rejecting the Union's First

Amendment challenge in this case.[23]

Finally, and most significantly, we find strong support for rejecting the

Union's First Amendment challenge in the fact that the Union's speech at issue in

this case involves a matter of little or no public concern.[24]  The Supreme Court has

recently reiterated that the "public concern" versus "private concern" distinction is

relevant and of significance when the First Amendment is asserted as a defense to

civil liability.  Snyder v. Phelps, --- U.S. ---, 131 S. Ct. 1207 (2011) (intentional

infliction of emotional distress).  In evaluating the rights of Westboro Baptist

---

[23]    The First Circuit relied in part on Gissel Packing when it reasoned that the union's liability in Dixon would survive a First Amendment challenge.  See Dixon, 504 F.3d at 84 ("There is an important difference between defending oneself, on the one hand, and threatening, intimidating, or otherwise interfering with someone's right to pursue a discrimination claim on the other.").

[24]    For this reason, the Supreme Court's "incitement" cases are distinguishable.  See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 914, 102 S. Ct. 3409, 3426 (1982) (involving a "politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself"); Hess v. Indiana, 414 U.S. 105, 94 S. Ct. 326 (1973) (per curiam) (antiwar demonstration); Brandenburg v. Ohio, 395 U.S. 444, 89 S. Ct. 1827 (1969) (per curiam) (Ku Klux Klan rally).  For the same reason, Rodriguez v. Maricopa County Community College District, 605 F.3d 703 (9th Cir. 2010), is distinguishable.
      The Union also cites DeAngelis v. El Paso Municipal Police Officers Ass'n, 51 F.3d 591 (5th Cir. 1995).  DeAngeles was a female police officer who brought a hostile work environment claim based on "evidence of a few written jibes, at women police officers generally and the plaintiff in particular, published in the police association newsletter."  Id. at 592.  The court described the evidence as "rife . . . with first amendment overtones" but resolved the case on non-constitutional grounds.  Id.  We understand the Fifth Circuit only to have opined, in dicta, that workplace harassment cases might implicate the First Amendment, at least where liability is based solely on statements about the role of women in a workplace.  Id. at 596–97.  DeAngelis is therefore not in tension with our analysis.

Church members picketing the funeral service of a deceased soldier, the Court indicated that: "Whether the First Amendment prohibits holding Westboro liable for its speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case.  Speech on matters of public concern is at the heart of the First Amendment's protection."  Id. at ---, 131 S. Ct. at 1215 (alterations and internal quotation marks omitted).  The Court also stated:

> Not all speech is of equal First Amendment importance, however, and where matters of purely private significance are at issue, First Amendment protections are often less rigorous.  That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: There is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas; and the threat of liability does not pose the risk of a reaction of self-censorship on matters of public import.

Id. at ---, 131 S. Ct. at 1215–16 (citations, alterations, and internal quotation marks omitted).  Thus, we inquire whether the Union's speech at issue here pertained to a matter of public concern or private concern.

It is significant that the jury focused on a narrow aspect of the Union's speech.  Liability was not based on the mere fact that the Union reported the existence of an EEOC charge.  Nor was liability based upon the Union's expression of its opinion that Plaintiffs' claims were "frivolous."  Rather, the ground on which the Union was held liable was its "call for reprisal"—the fact that the Union

32

identified Plaintiffs, invited Union members to retaliate against them for having filed EEOC charges, and threatened to impose assessments in order to fund the Union's defense.

Focusing on this narrow aspect of the Union's speech, we inquire whether the Union spoke on a matter of public or private concern. In Connick v. Meyers, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690 (1983), the Supreme Court held that, to fall within the realm of "public concern," the speech must "relat[e] to a[] matter of political, social, or other concern to the community." This determination depends on the "content, form, and context" of the speech "as revealed by the whole record." Id. at 147–48, 103 S. Ct. at 1690. In Morgan v. Ford, 6 F.3d 750 (11th Cir. 1993) (per curiam), we held that the plaintiff engaged in speech on a matter of private concern—and not on a matter of public concern—when she complained about sexual harassment to the superintendent of the prison facility where she worked, the Internal Affairs Division of the Georgia Department of Corrections, and the Georgia Office of Fair Employment Practices. We held that: "While we agree that the general subject of sexual harassment in the workplace is a matter of public concern, each complaint must be assessed on a case-by-case basis." Id. at 755 n.7. In holding that the plaintiff's complaints involved only matters of private concern, we noted:

> [Plaintiff] did not relate her concerns about sexual harassment to the
> public, or attempt to involve the public in any manner. [Plaintiff's]

33

> expressions in no way drew the public at large or its concerns into the picture.  The record shows that [plaintiff's] speech was driven by her own entirely rational self-interest in improving the conditions of her employment. . . . As an employee grievance, [plaintiff's] speech was not a matter of public concern.

Id. at 755 (footnote, citation, alteration, and internal quotation marks omitted).[25]

On the basis of the foregoing precedent, and on the basis of our independent review of the record, we conclude that Plaintiffs' filing of their EEOC charges in this case was not a matter of public concern.  By similar reasoning, we conclude that the Union's response was not speech on a matter of public concern.  Even if we considered the Union's response as a whole (rather than the particular aspects which formed the basis of the Union's liability), it was merely a response to Plaintiffs' personal grievances.  When we focus on the narrow basis upon which the Union was held liable, it is even clearer that there is little or nothing of public interest or concern in the Union's statements or the Union's threat that the members might have to pay additional assessments.  Neither Plaintiffs' charges nor the Union's Memo "attempt[ed] to involve the public in any manner" or "in [any] way drew the public at

---

[25]    This holding in Morgan v. Ford is consistent with the reasoning of Smolla and Nimmer:

> In deciding whether speech is a matter of public concern . . . , courts should not fall for the glib assertion that because matters of race and gender are, at the broadest level of abstraction, clearly issues of public concern, all racist and sexist remarks automatically qualify.  To the contrary, most speech sufficient to meet the reasonable person standard of [Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S. Ct. 367 (1993),] will not be legitimately characterized as speech on public concern.

Smolla, supra Part IV.B, § 13:17, at 13-35 to -36.

34

large or its concerns into the picture." Id. at 755 (alteration and internal quotation marks omitted). Neither Plaintiffs' charges nor the Union's Memo was disseminated to the public. The Union's Memo was sent only to its own bargaining unit members. The Union's liability for its statements presents "no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas." Snyder, --- U.S. at ---, 131 S. Ct. at 1215 (internal quotation marks omitted). Rather, the Union's Memo "was speech solely in the individual interest of the speaker and its specific . . . audience." Id. at ---, 131 S. Ct. at 1216 (internal quotation marks omitted). Thus, the content (the naming of Plaintiffs, the implicit "call for reprisal," and the threat to make assessments), the form (dissemination to a limited membership rather than the public at large), and the context (a mere personal response to Plaintiffs' personal grievances) all indicate that the speech at issue was not on a matter of public concern.[26]

In rejecting the Union's argument that the First Amendment immunizes its speech in this case, we place primary reliance on the fact that the Union's speech is about a matter of little or no public concern. We find support for this position in the foregoing authorities, and also in a leading treatise. In the related context of hostile work environment claims, Smolla, supra Part IV.B, § 13:11, at 13-24.2, opines:

---

[26]    We further note that the Union is a non-governmental organization and that there is no indication that Plaintiffs' charges were a topic of local news interest at the time of the Memo's dissemination. The newspaper article that was posted on station bulletin boards was published well over a year later, after Plaintiffs initiated their lawsuit.

"[H]ostile environment cases should be understood as consistent with general First Amendment standards because the speech in such cases is not a matter of public concern, and does more than cause mere emotional distress—it invades a legally cognizable interest of the employee that arises from the employment setting."

On the basis of our independent review of the record, and for all of the foregoing reasons, we reject the Union's First Amendment defense in this case.

## V.    PLAINTIFFS' CROSS-APPEAL AGAINST THE UNION

Nine days after the entry of judgment, Plaintiffs moved for various forms of equitable relief against the Union.  The district court denied Plaintiffs' motion, and Plaintiffs cross-appealed.  We review for abuse of discretion, see Rice v. Ford Motor Co., 88 F.3d 914, 918–19 (11th Cir. 1996), and conclude that Plaintiffs have demonstrated none.  We have said that, "[i]n cases presenting abundant evidence of consistent past discrimination, injunctive relief is mandatory absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law."  Cox. v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1561 (11th Cir. 1986).  The evidence in this case, however, did not require the district court to enjoin the Union from taking further retaliatory actions.  Nor was the district court required to second-guess the jury's damages awards, or the apportionment of damages between the two defendants, where they were supported by sufficient evidence.  We note, however, that Plaintiffs are entitled to post-judgment interest

36

with respect to the awards of both compensatory and punitive damages.  28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."); Redondo Constr. Corp. v. P.R. Highway & Transp. Auth. (In re Redondo Constr. Corp.), 700 F.3d 39, 42 (1st Cir. 2012) ("Postjudgment interest is mandatory and the prevailing party is entitled to it even if the district court made no provision for its payment."); Bank S. Leasing, Inc. v. Williams, 778 F.2d 704, 706 (11th Cir. 1985) (holding that post-judgment interest accrues on the entire award, including punitive damages).

## VI.    CONCLUSION

We reverse the entry of judgment in favor of the County and order that judgment be entered against the County on the verdicts as returned.  In all other respects, the judgment of the district court is affirmed.

**AFFIRMED IN PART and REVERSED IN PART.**