[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14848

_____

D.C. Docket No. 0:12-cv-61164-WPD

CHERYL CLARK, M.D.,

Plaintiff - Appellant,

versus

SOUTH BROWARD HOSPITAL DISTRICT,
d.b.a. Memorial Healthcare System,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 31, 2015)

Before HULL and JULIE CARNES, Circuit Judges, and ROTHSTEIN,[*] District
Judge.

JULIE CARNES, Circuit Judge:

_____

[*] Honorable Barbara J. Rothstein, United States District Judge for the Western District
of Washington, sitting by designation.

Plaintiff Dr. Cheryl Clark appeals the district court's grant of summary judgment in favor of her former employer, South Broward Hospital District ("Hospital"), on her claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), and the Florida Civil Rights Act, Fla. Stat. § 760.10.  In the district court, Plaintiff claimed that, because of her sex and in retaliation for filing an EEOC charge, the Hospital took several adverse employment actions against her, culminating in her discharge from employment. After careful review and with the benefit of oral argument, we affirm the district court's grant of summary judgment on all claims.

## I. Background

### A.  Factual Background[1]

Plaintiff is a female doctor employed by the Hospital in the Critical Care Department ("CCD") from January 2005 to March 2012.  At all times relevant to this litigation, the Hospital employed a Director/Chief[2] and fourteen additional physicians within the CCD, three of whom were female.  In 2006, Plaintiff became

---

[1]  We set out the facts and evidence in this section in the light most favorable to the non-moving party, the plaintiff.  *See Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1349 (11th Cir. 2007).

[2]  The "Chief" title is informal and reflects an intra-departmental designation, while the "Director" title is a contractual, salaried position.  One individual fills both roles.

2

the CCD Vice-Chief,[3] which carried with it additional responsibilities, including writing protocols, developing standardized forms, and obtaining medical equipment. She also created the CCD's monthly work schedule, for which she was paid her normal hourly rate and earned approximately $20,000 annually.

During Plaintiff's tenure as Vice-Chief, there were two instances—one in 2008 and one in 2010—where the CCD Director could not attend a Hospital meeting. Instead of sending Plaintiff to the meeting, the Director, Dr. Walter Severyn, asked a well-respected male physician to attend in his absence. According to Severyn, he did not send Plaintiff because, in his opinion, Plaintiff was not sufficiently well-liked to represent the CCD to the Hospital at large. When Severyn announced his retirement, he told Plaintiff that she should not apply for the Director position because she was "too direct" and "too confrontational."

Before selecting a permanent Director, the Hospital chose Dr. Seong Lee, a male surgeon from a different department, to act as the Interim Director/Chief. On August 19, 2010, shortly after Lee began his stint as the acting Director, Plaintiff complained to Dr. Stanley Marks, the Senior Vice President and Chief Medical Officer of the Hospital, about the selection of Lee for this spot. Plaintiff asked why someone was brought in from another department, and she claims that Marks became upset, yelled at her, and told her she risked being fired unless she

---

[3] Like the "Chief" title, the "Vice-Chief" designation is an informal intra-departmental title that provides no additional salary for the holder of this title.

3

supported Lee.  The next day, Plaintiff reported this conversation to Human Resources and alleged that she had been passed over for the Interim Director position because she is a woman.

On November 18, 2010, in his capacity as Interim Director, Dr. Lee called a department-wide meeting to discuss Plaintiff's scheduling practices because the other physicians had complained that Plaintiff was creating unfair schedules.  All fourteen doctors in the CCD attended, as well as Lee and Dr. Macaluso, the Hospital's Director of Medical Affairs.  Tensions escalated during the meeting, and two male physicians shouted at Plaintiff, stating that she was intimidating and unapproachable and that she created imbalanced schedules.  Plaintiff exited the room mid-meeting and immediately filed for a two-month leave of absence beginning the next day.  After she left, Macaluso requested that the other doctors in the CCD document in writing any complaints they might have about Plaintiff.  A few days later, while on her self-imposed leave of absence, Plaintiff attempted to log into the scheduling system and discovered that she had been barred from the system and that her scheduling duties were now being handled by Interim Director Lee.

Plaintiff filed her first EEOC charge on December 8, 2010, alleging gender discrimination because of:  (1) former Director Severyn's failure to allow her to attend meetings in his absence; (2) Severyn's advising her not to apply for the

4

Director position; (3) the Hospital's hiring of a male interim Director; (4) Marks' threatening to fire her in August 2010 for questioning the hiring of Dr. Lee as Interim Director; (6) the verbal abuse she suffered at the November 18 department-wide meeting; and (7) her loss of scheduling duties once she went on leave of absence.  She alleged that the reasons given for the above incidents—that she was "too confrontational" and "intimidating"—were pretexts for discriminating against a woman "acting out of role."  Two days later, on December 10, Plaintiff met with Human Resources about her complaint.  The Hospital then began an internal investigation and interviewed many of Plaintiff's co-workers.  It found no evidence of gender discrimination, but did conclude that Plaintiff had many interpersonal conflicts with her co-workers.

Also in December 2010, Plaintiff applied for the permanent Director position.  She received a telephone interview with an external recruiter but was not further considered for the position because the recruiter determined she lacked previous supervisory experience:  a necessary qualification for the job.  Notably, although Plaintiff returned to work from her voluntary two-month leave of absence in January 2011, she worked less than a month before taking a second leave of absence for three more months, from February to May 2011.

Approximately a year after the above events, in February 2012, the Hospital hired Dr. Aharon Sareli as the permanent CCD Director/Chief.  Shortly after taking

5

over the reins, Sareli began receiving complaints from CCD physicians that they felt bullied and physically threatened by Plaintiff. These complaints led to a second internal investigation by Human Resources. Ultimately, because of the seriousness of the misconduct attributed to Plaintiff, the Hospital hired an independent investigator, Wayne Black, to look into these complaints. Black interviewed over forty of Plaintiff's peers and co-workers. These individuals reported many instances of misconduct by Plaintiff, including her threats that she would leave the Hospital "in a trail of blood" and "bring down the group." Indeed, some co-workers reported feeling physically afraid of Plaintiff. Others reported that Plaintiff made degrading and abusive comments to patients.

In March 2012, the Hospital's executive team met to review and discuss the investigation results. Black presented his detailed findings orally and in a written report. Ray Kendrick, Senior Vice President for Human Resources, verbally shared with the executive team alleged racist and bigoted remarks made by Plaintiff that were reported to Human Resources. Based on the information presented in that meeting, the Hospital decided to terminate Plaintiff's employment on March 28, 2012. Plaintiff thereafter filed an amended EEOC charge alleging that this employment termination was discriminatory and retaliatory.

6

## B. Procedural History

Plaintiff filed her First Amended Complaint against the Hospital on January 31, 2013, alleging gender discrimination, retaliation, and the existence of a hostile workplace environment, in violation of Title VII and the Florida Civil Rights Act.[4] In its answer, the Hospital asserted that no matter Plaintiff's gender or the fact she had filed an EEOC complaint, it would have made the same decisions with respect to Plaintiff because of her "leaves of absence and her misconduct as to employees and patients, including, but not limited to, inappropriate behaviors, screaming at and intimidating employees; demeaning employees, patients, and patients' families; and making profane, violent, and racist statements . . . ." Following discovery, the district court granted the Hospital's motion for summary judgment on all counts and entered a final judgment. This timely appeal follows.

## II. Standard of Review

We review a district court's grant of summary judgment de novo, viewing all evidence in the light most favorable to the non-moving party. *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011). A movant is entitled to summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute about a

---

[4] "Because the [Florida Civil Rights Act] is modeled after Title VII, and claims brought under it are analyzed under the same framework, the state-law claims do not need separate discussion and their outcome is the same as the federal ones." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010).

7

material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III. Discussion

On appeal, Plaintiff argues that the district court erred by: (1) finding that Plaintiff did not suffer any adverse employment actions prior to her termination; (2) granting summary judgment to the Hospital on her discriminatory discharge claim and (3) retaliatory discharge claim; and (4) granting summary judgment to the Hospital on Plaintiff's discriminatory and retaliatory hostile work environment claims. We address each issue in turn.

### A. Pre-Termination Adverse Employment Actions

When a plaintiff offers only circumstantial evidence to prove her Title VII claim, as Plaintiff does here, we employ the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007); *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). Under this framework, a plaintiff bears the burden of establishing a prima facie case, which creates a rebuttable presumption that the employer acted illegally. To establish a prima facie Title VII disparate treatment claim, a "plaintiff must show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an

8

adverse employment action, and (4) was replaced by someone outside the protected class or that her employer treated similarly situated employees outside of her class more favorably." *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004). To establish a prima facie Title VII retaliation claim, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) causation. *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012).

Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory, non-retaliatory reason for its action. *Crawford*, 482 F.3d at 1308 (applying framework in disparate treatment context); *Brown*, 597 F.3d at 1181 (applying framework in retaliation context). The employer need not persuade the court that it was actually motivated by the proffered reason, only that the reason existed and was legitimate. *Crawford*, 482 F.3d at 1308. If the employer articulates one or more reasons, the presumption of discrimination is rebutted, and the burden of production shifts back to the plaintiff to offer evidence that the employer's stated reason was a pretext for illegal discrimination. *Id.* If the employer proffers multiple reasons, the plaintiff must rebut each one to survive summary judgment. *Id.*

In both discrimination and retaliation claims, a plaintiff must show that she suffered a specific "adverse action." *See Cuddeback*, 381 F.3d at 1235 (plaintiff

9

must show she "suffered an adverse employment action" in a prima facie Title VII discrimination claim); *Chapter 7 Trustee*, 683 F.3d at 1258 (plaintiff must show she "suffered a materially adverse action" in a prima facie Title VII retaliation claim). Being fired is, of course, an adverse action. But any other action by an employer that falls short of actually terminating the employee can constitute an adverse action only if it "in some substantial way, alter[s] the employee's compensation, terms, conditions, or privileges of employment, deprive[s] her of employment opportunities, or adversely affect[s] her status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (quoting *Gupta v. Fl. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)). To be considered adverse, the action must cause "a *serious and material* change in the terms, conditions, or privileges of employment." *Id.* at 970–71 (emphasis added). Title VII "does not require proof of direct economic consequences in all cases," but "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). This Court applies an objective test and asks "whether a reasonable person in the plaintiff's position would view the employment action in question as adverse." *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000) (quotation omitted and alteration adopted). For an action to be "adverse" in the retaliation context, it "must be harmful to the point that [it] could well dissuade

10

a reasonable worker from making or supporting a charge of discrimination."
*Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

Plaintiff argues that the district court erred in finding that no adverse actions occurred as a result of the Hospital (1) taking away her scheduling duties, which had earned her an additional $20,000 per year and (2) assigning her fewer shifts than she requested during the month after she had returned from her second leave of absence. She also argues that the district court erred in denying relief on her claim that the Hospital discriminated and retaliated against her when it denied her a promotion to the Director/Chief position.

### 1.    Loss of Scheduling Duties

As noted, the Hospital relieved Plaintiff of her scheduling duties shortly after Plaintiff announced in late November 2011 that she would be taking a two-month leave of absence. Plaintiff contends that the Hospital's action constituted an adverse action that it took to retaliate against her for having filed an EEOC charge around the same time period. The district court acknowledged that removing Plaintiff's scheduling duties, for which she earned additional pay at the rate of around $20,000 per year, could potentially constitute an adverse employment action under Title VII. But it also concluded that Plaintiff was hard-pressed to

11

fault the Hospital because it was Plaintiff who brought about this result by voluntarily taking a lengthy leave of absence.[5]

The district court is correct. It is difficult to understand how an employee who has taken a leave of absence can then complain when her employer takes her at her word and reassigns the duties she would normally perform. Whatever adversity she suffered, it was Plaintiff who brought it on herself by deciding to take a leave of absence. A reasonable person would not consider the reassignment of such duties in these circumstances to be an adverse action by the employer. *See Hinson*, 231 F.3d at 829. To the contrary, a reasonable person would understand that her employer must necessarily reassign such duties while she is absent from her job. Thus, we affirm the district court's conclusion that Plaintiff suffered no actionable adverse employment action as a result of the reassignment of her scheduling duties while Plaintiff was on leave.[6]

---

[5] The district court further explained that Plaintiff's scheduling duties "were not independent from her role as a physician at the hospital" because the former was not a salaried position, and Plaintiff was paid her regular hourly rate for creating the schedule. Thus, when she took a leave of absence, "she abandoned the scheduling duty." Specifically, for all her duties, Plaintiff's pay structure was based on the number of hours she worked.

[6] Plaintiff has not asserted that she requested a reinstatement of scheduling duties once she returned from her two leaves of absence, nor has she explicitly argued that the Hospital's failure to reinstate those duties constituted gender discrimination or retaliation. Nevertheless, to the extent that Plaintiff makes such an argument, we note that she has offered no evidence of disparate treatment of a similarly situated comparator. Further, numerous complaints by coworkers about Plaintiff's unfairness in making scheduling assignments constitute a neutral, non-discriminatory reason for transferring these scheduling duties to the Director, and Plaintiff has not shown that this explanation is a pretext for discrimination.

12

2.    Loss of Shifts

Before her return from her second leave of absence, Plaintiff emailed Dr. Lee and requested that she be given fourteen night-shifts for June 2011. After the schedule was published, Plaintiff was unhappy to learn that she had received only twelve shifts, whereas some other doctors had been given more shifts. She emailed Dr. Lee demanding an explanation. Dr. Lee responded, explaining that inherent difficulties in creating a schedule to accommodate the preferences of all doctors on staff had led to Plaintiff's particular schedule for that month. He noted that in each 24-hour period, there are five day-shifts and only two night-shifts. For that reason, day-shift doctors are always scheduled for a few additional shifts, and Plaintiff had requested to continue working exclusively night-shifts, as she had done throughout her employment at the Hospital. Additionally, several day-shift physicians had requested vacation time that month, resulting in fewer day-shifts physicians taking on extra day-shifts. Dr. Lee also mentioned that, as Plaintiff was aware, individual doctors' requests could not be honored "100% of the time despite [his] best efforts." Finally, Dr. Lee apologized and noted, "Schedule issues are specifically brought up at every monthly Team meeting, so everyone can have some input into how we can improve this complicated process together."

The following month, Plaintiff was assigned fifteen night-shifts, and she has not alleged that she was dissatisfied with her shift assignments on any occasion

other than this one isolated month. But nonetheless she argues that, by giving her two fewer shifts than she had requested for one month (costing her $4,064 in income), the Hospital acted adversely toward her and did so in retaliation for her having filed internal and EEOC complaints. In light of the difficulties and vagaries of accommodating a particular doctor's shift preferences in any given month, we conclude that the Hospital's failure, on one month only, to give Plaintiff the number of shifts she had requested, did not constitute an adverse action because this decision did not cause a serious and material change in the terms, conditions, or privileges of employment, which is what is required before an employer's action can be deemed to be adverse. *Crawford*, 529 F.3d at 970–71. Nor can we conclude that a reasonable person in Plaintiff's position would view this isolated action as adverse or that it would dissuade a reasonable worker from making or supporting a charge of discrimination. *See Hinson*, 231 F.3d at 829; *Burlington Northern*, 548 U.S. at 57. Out of the many months that Plaintiff had worked at the Hospital, she complains that in only one month did she happen to receive fewer shifts than she requested. Moreover, even if one assumed that this June 2011 shift assignment constituted an adverse action, Dr. Lee's explanation provided a neutral, non-discriminatory, non-retaliatory reason for the number of shifts assigned. *Crawford*, 482 F.3d at 1308; *Brown*, 597 F.3d at 1181.

14

3.    Non-Promotion Claim

As to Plaintiff's final allegation of a pre-termination adverse action, she contends that by not promoting her to the Director position after Dr. Severyn retired, the Hospital discriminated against her based on her gender.  The district court refused to consider Plaintiff's non-promotion claim concluding that Plaintiff failed to sufficiently plead the issue.  We disagree.  Plaintiff's complaint alleges: "[T]he refusal to allow [Plaintiff] to apply for the position of Medical [D]irector or Chief and when she did so anyway, the refusal to even give her an interview . . . was motivated by [P]laintiff's gender."  We will assume that this language was sufficient to plead a claim based on the Hospital's decision not to promote Plaintiff.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.").

But even though the claim may have sufficiently been pled, Defendant is entitled to summary judgment.[7]  "Under the *McDonnell Douglas* framework, to prevail on a claim of failure to promote, a plaintiff may establish a prima facie case of sex discrimination by showing that:  (1) she is a member of a protected class; (2)

_____

[7] *See Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1309 (11th Cir. 2012) ("[We] may affirm the judgment of the district court on any ground supported by the record, regardless of whether that ground was relied upon or even considered by the district court.").

15

she was qualified and applied for the promotion; (3) she was rejected despite her qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004). Assuming without deciding that Plaintiff established a prima facie case of gender discrimination, Plaintiff is not entitled to relief on this claim.

The only admissible evidence in support of Plaintiff's gender discrimination claim is her assertion that Dr. Severyn told her she should not apply for the Director position because she is "too confrontational" and "too direct."[8] Plaintiff took Severyn to actually mean that she should not apply because she is a woman. To the contrary, there is ample evidence that Plaintiff was very confrontational, under even the strictest interpretation of that word. An employer could reasonably conclude that supervisory duties and Plaintiff's extremely confrontational personality would make for a volatile mix.

---

[8] In her brief, Plaintiff repeatedly asserts that Dr. Severyn informed her that she should not apply because she was a woman. This assertion is contradicted by Plaintiff's own sworn, deposition testimony, in which she stated that Severyn advised her not to apply because she was too confrontational and direct. At oral argument, Plaintiff's counsel conceded that the only evidence supporting the contrary assertion in her brief is the deposition testimony of Ray Kendrick recounting Plaintiff's statement to Kendrick that Severyn had told Plaintiff she would not get the job due to her gender. Plaintiff does not attempt to explain why her statement to Kendrick is non-hearsay, is subject to some hearsay exception, or is otherwise admissible to show that Severyn actually made this statement. That being so, the only admissible evidence in the record, which is supplied by Plaintiff's own sworn testimony, is that Severyn's comments were as described in text.

16

In addition, the Hospital presented further evidence that its reasons for not choosing Plaintiff as Director were non-discriminatory and non-pretextual.  First, the Hospital sought for its Director someone with prior supervisory experience. Plaintiff has presented no evidence of previous direct supervisory leadership experience.  In contrast, Dr. Sareli had leadership experience serving as chief resident, class representative in medical school, and "director for satellites and subspecialty programs" at the Penn Sleep Center.  Dr. Lee, the Interim Director, served as Medical Director of Surgical Critical Care in Trauma Services prior to his term as CCD Director.

Moreover, in discrimination claims based on a failure to promote, a plaintiff cannot prove pretext by merely showing she was more qualified than the person who received the position.  *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007).  Instead, a plaintiff must show "that the disparities between the successful applicant's and [her] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004), *cert. denied*, 546 U.S. 960 (2005) (internal quotations omitted)).  Plaintiff does not meet this standard.  As noted, any objective observer would readily conclude that Dr. Sareli's leadership experience clearly dwarfed Plaintiff's.

17

Finally, the Hospital presented evidence that it had decided not to hire as the new Director any current employee from within the CCD, given the internal discord and rancor between existing employees there. The Hospital concluded that no internal candidate within the CCD could command the respect necessary to lead as Director. The Hospital adhered to this decision by hiring outside the Department. This justification constitutes an additional non-discriminatory reason for not promoting Plaintiff, which Plaintiff has failed to show is was pretextual.

## B.  Gender Discrimination Discharge Claim

Plaintiff claims that the Hospital discriminated against her because of her gender when it fired her. Because no direct evidence of gender discrimination exists on this record, we apply the burden-shifting framework of *McDonnell Douglas*. The latter requires (1) Plaintiff to first make out a prima facie, (2) after which the burden shifts to the Hospital to articulate a non-discriminatory reason for its employment action, (3) with the burden thereafter shifting back to Plaintiff to offer evidence of pretext. *Crawford*, 482 F.3d at 1308. To make a prima facie case, Plaintiff must first show that she "(1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class or that her employer treated similarly situated employees outside of her class more favorably." *Cuddeback*, 381 F.3d at 1235.

18

The district court found that Plaintiff failed to establish a prima facie case of gender discrimination for her employment termination because she did not present comparator evidence that a similarly-situated male employee was treated more favorably when presented with similar accusations of misconduct. We agree. "In order to be considered 'similarly situated,' the compared employees must have been 'involved in or accused of the same or similar conduct,' yet 'disciplined in different ways' for that conduct." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1346 (11th Cir. 2011). There is no evidence on the record that similar reports of misconduct were made against any other employees, so Plaintiff has failed to present comparator evidence sufficient to make a prima facie case.

Plaintiff argues that her lack of comparator evidence does not doom her claim because we have held that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive [] summary judgment;" instead, a plaintiff will survive summary judgment if she presents a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Smith*, 644 F.3d at 1328. But Plaintiff has not presented a "convincing mosaic" of evidence suggesting that her employment termination was motivated by her gender. In *Smith*, there was substantial evidence of discriminatory racial animus, including documented racial tensions following a workplace shooting resulting from racism

19

against black employees. *Id.* at 1329–30. Any evidence of gender-motivated animus is entirely lacking in this case.

Moreover, even assuming that Plaintiff established a prima facie case of gender discrimination, the allegations of misconduct made against Plaintiff amply supply an adequate non-discriminatory, non-pretextual reason for firing her. Mr. Kendrick informed the Hospital's executive team of the racist and anti-Semitic remarks that Plaintiff allegedly made, such as "listen to the stupid nigger," and "that's all we need another fucken (sic) South African Jew." In fact, Plaintiff admitted during her deposition that she might have "teasingly" referred to one of her colleagues as a "fucking Jew." Investigator Black's report showed that at least two witnesses reported feeling physically afraid of Plaintiff, and numerous witnesses reported that Plaintiff made threatening statements, including: (1) she would "leave in a trail of blood"; (2) there "will be causalities (sic) in this group"; and (3) she was "leaving this place with a boom and will bring down the group."

Plaintiff responds that she never made any of those comments, but significantly, the question is not whether Plaintiff actually engaged in the alleged misconduct. Rather, it is whether the Hospital in good faith believed the reports of misconduct. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266–67 (11th Cir. 2010) (the "question is whether her employers were dissatisfied with her for [] non-discriminatory reasons, even if mistakenly or unfairly so"); *Elrod v.*

20

*Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (inquiry is limited to whether employer *believed* plaintiff was guilty of misconduct and if so, whether that was reason behind discharge; that employee did not actually engage in misconduct is irrelevant).

Here, the Hospital had received multiple reports of Plaintiff's inflammatory remarks and aggressive personality.  It took these reports seriously enough to initiate a formal investigation.  Plaintiff has provided no reason to suspect that the Hospital did not honestly believe the truth of the allegations against Plaintiff.  That being so, the serious misconduct alleged by co-workers easily constitutes a non-discriminatory reason for terminating Plaintiff's employment.  Accordingly, her discriminatory termination claim fails.

## C.  Retaliatory Discharge Claim

Title VII prohibits employers from retaliating against an employee because she has opposed acts made unlawful by Title VII.  42 U.S.C. § 2000e-3(a).  Absent direct evidence that an employer has so acted, we employ the *McDonnell Douglas* burden-shifting framework when analyzing claims for retaliation.  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).  A plaintiff must first make a prima facie case by showing (1) that she engaged in statutorily protected activity, (2) that she suffered a materially adverse action, and (3) that the protected activity caused the adverse action.  *Chapter 7 Trustee*, 683 F.3d at 1258.  Then, the

21

burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment action, which the plaintiff can rebut with evidence of pretext. *Id.*

Plaintiff alleges that the Hospital fired her in retaliation for her having engaged in statutorily-protected activities. The district court, however, concluded that Plaintiff had failed to make a prima facie case of retaliation because she had not established a causal connection between the filing of her December 2010 EEOC charge and the Hospital's subsequent March 2012 termination of Plaintiff, which followed an investigation in February 2012 of allegations of misconduct by Plaintiff. In so ruling, the district court focused on the long time period between Plaintiff's EEOC complaint and the Hospital's ultimate decision to fire her.

The time period between an employee's protected activity and an employer's adverse action often figures prominently in a determination whether the employee's act caused the employer's reaction. This is so, because absent some other evidence of a causal relation between the two, a short time-span between the two events is often all that an employee will be able to offer to support her contention that it was her protected activity that prompted the employer to visit some negative action on her. And it is up to the employee to prove that "the desire to retaliate was the but-for cause of the challenged employment action." *Booth v.*

*Pasco Cnty., Fla.*, 757 F.3d 1198, 1207 (11th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517, 2528 (2013)).

Thus, an employee's success in showing causation will often be strongly correlated with the shortness of the time that has elapsed between the employee's protected activity and the employer's alleged reaction to that activity.  We have held that sometimes causation can be established by "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action, . . . [but] *the temporal proximity must be 'very close.'*"  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (emphasis added).  A time period as much as one month between the protected activity and the adverse action is not too protracted to support causation.  *Wideman v. Wal-mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).  But in the absence of any other evidence, we have also found three months between the protected activity and an adverse employment action to have been insufficient to establish causation.  *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006); *see also Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) (holding that, by itself, three and one-half months between protected activity and adverse action was insufficient to prove causation).

On appeal, Plaintiff argues that the district court erred in finding that she failed to prove the necessary causal nexus between her December 2010 EEOC

23

charge and the Hospital's decision, fifteen months later, to fire her.  She acknowledges that this one-year plus time span between the protected activity and her ouster by the Hospital exceeds the length of time that our caselaw generally recognizes as being short enough to imply a causal connection.  She counters, however, that, in reality, the Hospital had decided to fire her immediately after her initial internal complaint in August 2010 but, to avoid any claim of retaliation, it delayed in actually pulling the trigger on this decision until enough time had passed to allow it to avoid suspicion.

The problem with Plaintiff's argument is that she has no evidence to support it.  On this subject, Kendrick testified that discussions about Plaintiff's poor interactions with others began in August 2010 but that discussions about firing her did not occur until March 2012, the same month she was fired.  In short, Plaintiff's argument is speculative and does not undermine the Hospital's argument that Plaintiff has failed to show a causal connection between her complaints and her later termination.

Plaintiff also offers a second argument, which is that she continually engaged in protected activity from the time she filed her first internal complaint in August 2010 until she was fired in March 2012 and that her series of protected activities, accompanied by a series of alleged adverse employment actions, should

24

be bundled up and considered as a totality of circumstances to prove causation by temporal proximity.

A plaintiff who relies on a theory of temporal proximity must identify a specific instance of a protected activity that is known to the employer's decision-maker and that shortly precedes an adverse employment action. *See Wideman*, 141 F.3d at 1457 (calculating time period between filing of EEOC charge and adverse action); *Drago*, 453 F.3d at 1308 (calculating time period between verbal complaints to manager and filing of EEO complaint and adverse action). On the record before us, the latest undisputed instance of Plaintiff's protected activity occurred on July 29, 2011, when she complained to Human Resources that the internal investigation was "retaliatory." This was approximately eight months before the Hospital fired her, which again is too remote in time to support an inference of causation without more evidence, and Plaintiff has presented no additional evidence.

But Plaintiff offers another wrinkle to her "temporal proximity" argument. She notes that because her attorney submitted a series of "open record act" requests to the Hospital to support her December 2010 EEOC charge, with the latest of these occurring in the same month she was fired (March 2012), her last protected act should be deemed to have occurred at that time. Plaintiff cites no authority for the proposition that, to keep the causal nexus window open, a Plaintiff can

25

continue refreshing what might otherwise be deemed stale protected activity, merely by repeatedly seeking information from the employer that might shore up the long-ago complaint.  Further, there is no evidence that the Hospital was even aware of Plaintiff's latest, March 2012 "open records act" request.

But, at any rate, we will assume, with more than a little skepticism, that Plaintiff provided sufficient evidence of temporal proximity to keep her claim alive at the prima facie stage, thereby shifting the burden to the Hospital to show a neutral non-retaliatory reason for firing her.  However, as noted *supra* at 20–21, the Hospital has offered non-discriminatory reasons for terminating Plaintiff's employment that are sufficient to defeat her sex discrimination claim.  And those same reasons likewise remain powerful enough to defeat her retaliation claims.

Thus, we conclude that the Hospital presented abundant evidence of Plaintiff's multiple instances of misconduct and her ongoing interpersonal workplace conflicts, sufficient to justify a decision to terminate her.  Plaintiff has not offered any evidence that those reasons were pretextual.  *Brown*, 597 F.3d at 1181.  Accordingly, Plaintiff's retaliatory discharge claim also fails and we affirm the district court's grant of summary judgment on this claim.

## D.  Hostile Work Environment Claim

"To establish a hostile work environment claim under Title VII, the plaintiff must show that the workplace is permeated with discriminatory intimidation,

ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal quotations omitted). Specifically, to prove a prima facie case, a plaintiff must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious or of direct liability. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010). To make out a sex-based hostile work environment claim, one need not show that the environment was hostile in a sexual manner, but merely that it was hostile *because of* the plaintiff's gender. *See*, *e.g.*, *Onacle v. Sundown Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (holding that a woman may establish non-sexual, gender-based harassment by showing that the plaintiff is harassed in sex-specific and derogatory terms as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace).

The requirement that the harassment be "severe or pervasive" contains an objective and subjective element. The behavior must result in an environment

27

"that a reasonable person would find hostile or abusive," and one which the victim "subjectively perceive[s] . . . to be abusive." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002). In evaluating the severity of the harassment, we consider the totality of the circumstances, including the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's job performance. *Id.* Instances of alleged harassment are considered cumulatively rather than in isolation. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010).

Plaintiff alleged gender-based and retaliation-based theories for her hostile work environment claim, and the district court found that Plaintiff failed to prove either basis for the claim. *See Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012) (recognizing a cause of action for a Title VII retaliatory hostile work environment claim). We agree with the district court. Plaintiff cited four incidents to support her gender-based hostile work environment claim: (1) not being selected to attend the two Hospital meetings because she was "too confrontational;" (2) Dr. Marks confronting and yelling at her on August 19, 2010; (3) being humiliated at the November 18, 2010 meeting about her unfair scheduling; and (4) after Plaintiff left that meeting, Dr. Macaluso asking the other doctors to document their complaints about Plaintiff. The district court was correct

28

that Plaintiff failed to present any evidence that these events occurred *because of* her gender or were motivated by hostility to women in the workplace.

With respect to Plaintiff's retaliatory hostile work environment claim, the district court correctly found that Plaintiff failed to prove but-for causation required to establish a prima facie case. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517, 2534 (2013) ("a plaintiff making a retaliation claim under [Title VII] must establish that [] her protected activity was a but-for cause of the alleged adverse action by the employer").  Both meetings that Plaintiff was not selected to attend occurred prior to her first internal complaint made on August 20, 2010.  Additionally, Plaintiff failed to present evidence that the two physicians who shouted at her in the November 2010 meeting were aware of her August 2010 internal complaints.  *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (a decision-maker must have knowledge that the employee engaged in protected activity for a retaliation claim be actionable).  Setting aside those incidents, what remains are one or two unpleasant meetings insufficient to support a retaliatory hostile work environment claim.

Nor has Plaintiff offered any evidence that these incidents were motivated by her gender.  At most, the incidents Plaintiff alleges demonstrate that her difficulties with co-workers resulted from serious and ongoing interpersonal conflicts between Plaintiff and her co-workers.  We have emphasized that Title VII

29

is not a "general civility code" and does not make "ordinary [workplace] tribulations" actionable, so not all objectionable language and conduct will support a Title VII harassment claim. *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1234 (11th Cir. 2006) (internal quotations omitted). Similarly, personal animosity is not the type of harassment prohibited by Title VII, and a plaintiff cannot turn a "personal feud" into a Title VII claim. *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986); *see also Vore v. Indiana Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994) ("[P]ersonality conflicts between employees are not the business of the federal courts.").

Moreover, even if Plaintiff had presented evidence that the incidents were motivated by her gender or were retaliatory in nature, the totality of the circumstances was not sufficiently severe or pervasive to support her claim. *Compare McCann v. Tillman*, 526 F.3d 1370, 1378–79 (11th Cir. 2008) (a few instances of racially derogatory language over a period of two and one-half years were "too sporadic and isolated" to qualify as severe or pervasive) *with Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276–77 (11th Cir. 2002) (severe and pervasive conditions existed where co-workers called plaintiff racially offensive names three to four times per day). The few instances Plaintiff cites are not sufficiently egregious or frequent to support a claim of a hostile work environment. Thus, Plaintiff's hostile work environment claims also fail.

## IV. Conclusion

For the above reasons, we find no reversible error in the district court's grant of summary judgment in favor of the Hospital on all claims.  Accordingly, we affirm the final judgment.

**AFFIRMED.**